**E-FILED**
Friday, 24 January, 2014  11:52:41 AM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| RYAN M. BOYDSTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 12-cv-3310 |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

BYRON G. CUDMORE, U.S. MAGISTRATE JUDGE:

Plaintiff Ryan M. Boydston appeals from the denial of his application for Social Security Disability Insurance Benefits and Supplemental Security Income (collectively "Disability Benefits") under Titles II and XVI of the Social Security Act. 42 U.S.C. §§ 416(i), 423 1381a, and 1382c. This appeal is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c). Boydston has filed a Brief in Support of Motion for Summary Judgment (d/e 10) (Boydston Brief), and Defendant Commissioner of Social Security has filed a Motion for Summary Affirmance (d/e 12). The parties consented to have this case heard before this Court. Consent to the Exercise of Jurisdiction by a United States Magistrate Judge and Reference Order entered May 7,

2013 (d/e 9).  For the reasons set forth below, this the Decision of the Commissioner is affirmed.

## STATEMENT OF FACTS

Boydston was born on November 19, 1979.  Boydston completed high school and some additional vocational training.  Boydston previously worked as a truck driver, telemarketer, sales attendant, and warehouse/department manager.  Answer to Complaint (d/e 6), attached Certified Transcript of Proceedings before the Social Security Commission (R.), at 72, 10.

On July 18, 2007, Boydston was delivering 500 pounds drums of chemicals in the course of his employment.  Boydston slipped and fell, and one of the 500 pound drums fell on him, injuring him severely.   R. 453.  Boydston has not worked since that accident.  Since the accident, Boydston has suffered from myofascial pain, headaches, obesity, chronic neck pain, and back pain.  R. 58.[1]

On July 18, 2007, Boydston went to see Dr. Ernest Wallace, M.D., for evaluation after the accident.  Dr. Wallace diagnosed Boydston with low back pain without radiation, chest contusion, and right knee pain.

---

[1] Boydston also alleged that he had a brain tumor, right knee pain, and depression.  The ALJ found that these impairments were not severe.  R. 58-59.  Boydston does not challenge this finding on appeal.

Dr. Wallace found that Boydston's injuries from the accident appeared to be muscular and superficial.  Dr. Wallace restricted Boydston to light duty for a week.  R. 656.

On July 19, 2007, Boydston underwent a CT scan of his brain; MRI scans of his brain and cervical spine; and x-rays of his left hip, pelvis, and chest.  The MRI of the cervical spine showed a strain of the apical ligament.  The results of these tests were otherwise unremarkable.  R. 538, 546-47, 648, 651,

On July 19, 2007, Boydston saw Dr. Phillip Wilson, M.D., for evaluation.  Dr. Wilson diagnosed a left hip contusion, closed head injury, chest contusion, and right knee pain.  R. 652.  On July 23, 2007, Boydston saw Dr. Wilson.  Boydston reported that he was doing much better.  He was able to walk and climb stairs.  He could bend his back, and could lift a child weighing twenty-nine pounds.  Boydston had normal range of motion and straight leg testing was negative.  Dr. Wilson released Boydston to work.  R. 649.

On August 9, 2007, Boydston saw Dr. Wilson.  Boydston reported getting severe headaches when he returned to work.  Dr. Wilson prescribed Ultram.  Dr. Wilson restricted Boydston to sitting work and no lifting or driving a truck.  R. 646.

On August 13, 2007, Boydston saw Dr. Wilson.  Boydston reported continued pain.  Dr. Wilson noted marked tenderness in the cervical spine. Boydston had full range of motion in his cervical spine with some discomfort.  Dr. Wilson put Boydston on no work unless sitting work is available.  R. 645.

On August 29, 2007, Boydston started a course of physical therapy. R. 642-43.

On August 30, 2007, Boydston saw Dr. Wilson.  Boydston reported that he started physical therapy.  Dr. Wilson directed Boydston to continue with the physical therapy and return on September 17, 2007.  Dr. Wilson stated that he would recommend an independent medical evaluation if Boydston had not improved by then.  Dr. Wilson noted,

> COMMENT:  I think the prognosis on this gentleman is guarded.  I think there may be some type of secondary gain because I feel the subjective symptoms are more significant than objective findings.  This is my reason for recommending an independent medical evaluation if improvement is not dramatic over this approximately 2 week period of time.

R. 641.

On September 6, 2007, Boydston saw Dr. Joshua Warach, M.D., for a neurological consultation.  R. 539-41.  Boydston complained of back pain, cervical pain, and dull aching pain in the occipital region of his head.

Dr. Warach's examination was unremarkable.  Dr. Warach ordered x-rays,

MRIs, an EEG, and EMG/NCV studies.  He also referred Boydston to a

neurosurgeon, Dr. Terrence Pencek, M.D., for a consultation.  R. 541.

The results of the tests ordered by Dr. Warach were largely

unremarkable.  X-rays of Boydston's shoulders and spine taken on

September 6, 2007, showed no fractures and were otherwise

unremarkable.  R. 400-03.  An EEG taken on September 14, 2007, was

normal.  R. 404.  An MRI of the lumbar and cervical spine taken on

September 14, 2007, showed some degenerative disc disease at L5-S1,

but was otherwise normal.  R. 405-06.  The EMG/NCV studies conducted

on September 20, 2007, were largely unremarkable and showed no

cervical radiculopathy, plexopathy, or other neuropathy to explain

Boydston's symptoms.  Dr. Warach instructed Boydston to avoid heavy

lifting, strain, or other provocative activities.  R. 449-50.

On September 17, 2007, Boydston saw Dr. Wilson.  Boydston

reported that he still had pain.  Dr. Wilson stated that Boydston would

continue seeing his neurologist Dr. Warach, and would continue also

seeing him for pain medications and physical therapy.  R. 634.

On September 26, 2007, Dr. Wilson responded to a request from

Boydston's employer for documentation of the reason why Boydston could

not work.  Dr. Wilson stated that Boydston was experiencing severe neck pain and spasms with persistent headaches.  Dr. Wilson stated that Boydston could not work because of the pain and the need for pain medication.  R. 633.

On September 27, 2007, Boydston saw Dr. Wilson.  Dr. Wilson reported no change in Boydston's condition.  Dr. Wilson released Boydston to light duty work.  Boydston reported that his employer stated that light duty was not available.  R. 632.

On October 3, 2007, Boydston was discharged from physical therapy. The therapist reported that Boydston reached twenty-five percent of his goals.  Boydston continued to report pain and headaches.  R. 631.

On October 25, 2007, Dr. Warach conducted additional EMG/NCV testing on Boydston.  The results were again unremarkable.  Dr. Warach noted that other testing had been unremarkable as well.  Boydston reported some daytime sleepiness due to his medications.  He also reported low back pain with extended walking and heavy lifting.  Dr. Warach again told Boydston to avoid heavy lifting, straining, and other provocative activities. He also referred Boydston to a sleep specialist and a pain clinic.  R. 451. A subsequent sleep study showed no significant sleep apnea.  The sleep

specialist stated that Boydston's medications could be contributing to his sleepiness.  R. 484-85.

On December 7, 2007, Boydston saw Dr. Terrence Pencek, M.D. Dr. Pencek found tenderness in the back of the neck and scalp. Boydston's motor strength was 5/5 and his gait was steady.  Dr. Pencek recommended against surgery.  Dr. Pencek reviewed Boydston's MRI results.  He stated that Boydston could benefit from physical therapy and epidural steroid injections in the cervical spine.  R. 409-10.  Dr. Pencek ordered x-rays of Boydston's cervical and thoracic spine.  The results were unremarkable.  R. 411.

On January 3, 2008, Boydston saw Dr. Wilson.  Dr. Wilson stated, "On casual observation of this gentleman, he appears to be in good health, no distress.  Does not appear to be in any discomfort."  R. 627.  On examination, Boydston had limited range of motion in his neck and tenderness in the posterior of his neck.  The range of motion of his lower back was markedly limited.  Straight leg testing was negative.  Dr. Wilson noted Dr. Pencek's recommendation for injections.  Dr. Wilson stated that Boydston was on no work at this time.  R. 627.

On January 23, 2008, Boydston saw Dr. Warach.  Boydston reported continuing pain in his neck, worse with flexion of the head and neck, with

no improvement.  Boydston also reported persistent headaches and back pain.  Dr. Warach recommended another MRI of Boydston's brain, but Boydston did not want to do this.  A past MRI showed a hyperintense area in the basal ganglia of unclear etiology.  Boydston also refused to undergo physical therapy.  Boydston stated that physical therapy aggravated his pain.  Dr. Warach recommended injections.  R. 447-48.

On January 30, 2008, Boydston saw a pain specialist, Dr. Babu Prasad, M.D.  Boydston underwent a series of injections on January 30, February 12, March 4, and March 26, 2008.  R. 412-36.  Boydston reported that his back was doing a little better at the end of the series, but had numbness in his right leg.  R. 415

On February 13, 2008, Boydston saw Dr. Warach.  Boydston stated that after the first injections from Dr. Prasad, he had significant improvement for about three days, but then his neck and headache pain worsened.  Boydston reported, however, that he had only mild neck pain which was 90% better with no headaches and only mild intermittent back pain.  His back pain in the thoracic region was also 90% better.  On examination, Boydston reported that he felt as though his neck was "lifting off his spine" when he turned his head to the left or right.  At this time, Boydston was taking Hydrocodone, Ultram, and Nurofen for pain.  R. 443.

On March 10, 2008, Boydston saw Dr. Warach.  Boydston reported again that he had 90% improvement in neck and back pain and headaches. Boydston reported that the pain was worse with lifting.  He reported that Dr. Prasad's injections helped temporarily.  Dr. Warach adjusted Boydston's medications.  R. 560.

On April 1, 2008, Boydston saw a headache specialist, Dr. Mark Greenfield, M.D. in Kansas City, Missouri, metropolitan area.[2] Dr. Greenfield observed tenderness in the cervical, thoracic, and lumbar spine.  Dr. Greenfield noted positive straight leg testing with sciatic notch tenderness on the right and left.  Dr. Greenfield diagnosed cervical radiculopathy, headache, and neuralgia/neuritis/radiculitis.  R. 458-61.

On April 10, 2008, Boydston saw Dr. Warach.  Boydston reported that his pain and headaches had plateaued at 90% improvement since the onset of the pain after the accident.  Dr. Warach referred Boydston for a functional capacity evaluation.  R. 562.

On April 21, 2008, Boydston saw Dr. Wilson.  According to Dr. Wilson, Boydston had no improvement since his initial injury.  On examination, Dr. Wilson found normal range of motion in the neck and back, both with some minimal discomfort.  Straight leg testing was

---

[2] See R. 621 (stating that the Headache and Pain Center was in Leawood, Kansas.).

negative.  Patrick's maneuver of the lower extremities revealed a questionable positive on the right side.  Dr. Wilson noted that Boydston was a truck driver on no work because light duty was not available.  Dr. Wilson opined that Boydston was at his maximal medical improvement.  R. 622-23.

On April 30, 2008, Boydston saw Dr. David Gelber, M.D., for an independent medical evaluation.  On examination, Dr. Gelber found mild to moderate tenderness in the cervical and lumbar paraspinous muscles bilaterally with no significant spasm.  Boydston's muscle tone was normal and strength was 5/5.  Boydston's gait was normal.  Dr. Gelber diagnosed myalgia and myositis.  Dr. Gelber opined that Boydston's pain was myofascial, involving the neck and back.  The myofascial pain contributed to the headaches.  Dr. Gelber recommended proceeding with the functional capacity evaluation.  R. 453-55.

On May 1, 2008, Boydston underwent a functional capacity evaluation.  R. 509-24.  Boydston was found to be employable at his current demonstrated capacity, but limited to lifting 41 pounds to waist level and 25 pounds overhead.  Boydston could occasionally carry up to 33 pounds and push and pull 35 pounds.  The evaluation stated that Boydston was deconditioned and recommended work hardening therapy.  The

evaluation was signed by physical therapist Joe Williams and occupational therapist Tracey Maras.  R. 509.

On May 22, 2008, Boydston saw Dr. Warach.  Boydston again reported that his pain and headaches had plateaued at 90% improvement since the onset of the pain after the accident.  Boydston reported some intermittent lumbosacral pain with radiation down into his right leg. Dr. Warach reviewed the May 2008 functional capacity evaluation, and ordered the work conditioning/work hardening program with home exercise. Dr. Warach recommended another physical capacity evaluation after Boydston completed all medical management, but Boydston refused. R. 566.

On June 6, 2008, Boydston started work hardening therapy.  The therapy sessions were scheduled for four hours a day, four to five times a week.  R. 612.

On June 23, 2008, Boydston saw Dr. Wilson.  Boydston reported some improvement, but he still had pain.  On examination, Boydston had limited range of motion in his back.  Dr. Wilson stated that Boydston would continue the physical therapy and return on July 21, 2008.  In the interim, Dr. Wilson said no work.  R. 611.

On July 2, 2008, Boydston saw Dr. Greenfield.  Boydston reported that his pain had improved.  Boydston's pain and functional impairment were rated as mild.  Boydston reported that the pain did not interfere with his daily activities.  Boydston reported that he was undergoing physical therapy.  Dr. Greenfield administered cervical facet injections.  R. 456-57.

On July 17, 2008, Boydston saw Dr. Warach.  He again reported that his back pain, neck pain, and headaches were 90% better overall, but his lumbosacral radiating pain persisted.  Boydston reported that he completed the work conditioning; he reported that the conditioning did not improve his pain syndrome at all.  Boydston reported that he was going to undergo cervical facet injections by Dr. Greenfield in a week.  Dr. Warach started Boydston on a trial of Lyrica as an additional pain medication.  R. 568.

On July 21, 2008, Boydston saw Dr. Wilson.  Boydston continued to complain about neck pain and low back pain.  On examination, Boydston had limited flexion along the neck.  Straight leg testing in sitting position was questionable at 30 degrees for reproducing pain.  Boydston reported that he was going to have surgery in Kansas City.  R. 601.  The records from Dr. Greenfield in Kansas City give no indication that he recommended surgery.  R. 456-61.  Furthermore, neither party cites any medical records that reflect that any neck surgery was either recommended or performed.

On July 23, 2008, Boydston terminated his work hardening therapy. Boydston stated to the therapist that he was discontinuing therapy because he was scheduled to have surgery on his neck.  The therapist reported that Boydston had met 50% when he terminated the therapy.  R. 600.

On August 18, 2008, Boydston saw Dr. Warach.  Boydston again reported that he remained at a 90% improvement in his pain.  Dr. Warach changed Boydston's Lyrica prescription.  Dr. Warach also prescribed a TENS unit for pain.  R. 570.

On August 21, 2008, Boydston saw Dr. Wilson.  Boydston reported that another doctor told Boydston that he was permanently disabled. Boydston rated his pain as a 7 on a scale of 10.  Dr. Wilson opined that Boydston was capable of performing some work and was not totally disabled.  Dr. Wilson opined that Boydston had reached his maximal medical improvement and recommended a functional capacity evaluation for determining his work status. R. 599.

On September 8, 2008, Boydston saw Dr. Warach.  He again reported 90% improvement.  Dr. Warach changed the Lyrica prescription again.  Boydston reported that the TENS unit helped him cope with the low back pain, but the unit did not reduce the pain.  R. 571.

On September 24, 2008, Boydston saw Dr. Wilson.  Dr. Wilson stated that Boydston could return to work with a 25 pound weight limit and no lifting above the shoulder.  R. 596.

On October 8, 2008, Boydston saw Dr. Warach.  Boydston again reported 90% improvement in his pain.  He reported that the TENS unit provided a definite benefit.  He was taking Neurontin, Lyrica, and Ultram daily, with Hydrocodone for pain occasionally as needed.  Dr. Warach stated that Boydston appeared to be at his maximum medical improvement.  R. 572.

On October 22, 2008, Boydston underwent a functional capacity evaluation.  R. 525-38.  According to the evaluation recommendations, Boydston could sit, stand, and walk eight hours a day with intermittent change of position, and could function between the light and medium demand level.  R. 526.  The recommendations indicated that Boydston could occasionally bend at the waist with an extended reach, squat, kneel, and half-kneel; and could occasionally to frequently climb stairs, slat climb, reach with the upper extremities, and use a steering wheel.  R. 526.

On November 25, 2008, Boydston saw Dr. Wilson.  Dr. Wilson reported no changes in Boydston's condition.  Dr. Wilson deferred to a

Dr. Ward for limitations on returning to work.  R. 593.  Neither party explains the identity of Dr. Ward.

On November 26, 2008, Boydston saw Dr. Warach.  Dr. Warach found that Boydston had reached his maximum medical improvement. Dr. Warach stated that Boydston had a second functional capacity evaluation in October 2008.  Dr. Warach gave Boydston a slip to return to work with the restrictions set forth in that functional capacity evaluation. Dr. Warach also stated that Dr. Wilson had released Boydston to return to work.  R. 573.

On January 2, 2009, Boydston saw Dr. Warach.  Boydston reported that his pain and headaches had plateaued at 90% improvement. Boydston reported lumbar back pain that radiated down his right leg. Boydston reported some symptoms of depression, lack of motivation and difficulty concentrating.  Boydston denied any suicidal or homicidal ideations.  Dr. Warach referred Boydston to a psychiatrist.  R. 574-75.

On January 6, 2009, Boydston saw Dr. Wilson.  Dr. Wilson gave Boydston a slip limiting him to light duty work with a twenty-five pound weight limit on lifting, pushing, and pulling.  R. 592.

On February 17, 2009, Boydston saw Dr. Wilson.  Boydston reported that he was having more neck and back pain, with some radicular pain

down and to his buttocks.  On examination, Boydston's range of motion in his neck was intact, but he had pain and discomfort on flexion and extension.  Dr. Wilson stated that Boydston could perform light duty limited to sitting work or sedentary work in a recliner chair.  R. 591.

On May 5, 2009, Boydston saw Dr. Wilson.  Boydston complained of back and neck pain.  His wife came with Boydston and confirmed his complaints of pain.  Dr. Wilson changed Boydston at this time to no work status.  Dr. Wilson wrote:

> PLAN:      Due to the change in his neck pain and due to the fact it has been sometime since he has had an MRI of the neck, I have ordered an MRI of the neck to be done at this time.  In the meantime, no work.  Recheck after the MRI.

R. 589.

On May 19, 2009, Boydston underwent an MRI of his cervical spine ordered by Dr. Wilson.  The results showed mild straightening of the normal cervical lordosis with partial disk desiccation at C4-C5.  The results showed no significant stenosis.  R. 588.

On June 1, 2009, Boydston saw Dr. Wilson.  Dr. Wilson stated that the MRI showed no significant abnormalities other than a disk desiccation at C4-C5.  On examination, Boydston's range of motion in his neck and back was limited.  Dr. Wilson continued Boydston on no work status.  R. 587.

On July 17, 2009, Boydston applied for disability benefits.  Boydston alleged an onset date of July 18, 2007.  R. 3.

On September 21, 2009, agency physician Dr. Marion Panepinto, M.D., prepared a Physical Residual Functional Capacity Assessment. R. 660-67.  Dr. Panepinto opined that Boydston could lift twenty pounds occasionally, and ten pounds frequently; sit, stand, and/or walk six hours in an eight-hour day; and occasionally stoop; but had no other physical functional limitations.  R. 661-64.  Dr. Panepinto opined that Boydston was not "wholly credible—reported restrictions are not supported by objective findings."  R. 667.

On November 5, 2009, Boydston saw Dr. Wilson.  Dr. Wilson assessed Boydston with chronic neck and back pain.  He stated that Boydston would continue off work.  R. 671.  Dr. Wilson filled out a work status form in which he took Boydston off work.  Dr. Wilson listed the reason as chronic neck and back pain.  R. 669.

On November 21, 2009, Boydston was given a vocational assessment by a private vocational consultant.  The vocational consultant opined that there was not a stable labor market for suitable, gainful employment in Boydston's region.  The consultant recommended vocational rehabilitation to acquire new skills.  R. 583.

On December 4, 2009, Boydston saw Dr. Warach.  Boydston reported that his pain had gotten worse.  Boydston reported that he was only at a 40% improvement level overall since the accident.  Boydston reported lumbosacral pain that radiated down the right leg.  He reported right knee pain with occasional numbness in his toes.  Dr. Warach's physical examination was unremarkable.  Dr. Warach stated that Boydston could return to work on a light duty basis.  R. 680-83.

Dr. Warach ordered an MRI, x-rays, and another EMG/NCV study. R. 682-83.  The MRI and x-rays were unremarkable.  R. 680.  The EMC/NCV studies showed some mild carpal tunnel syndrome, but no other problems.  On December 14, 2009, Dr. Warach recommended neutral position wrist splints and injections.  R. 677-78.

On December 21, 2009, Dr. Warach saw Boydston.  Boydston decided not to have any more injections.  Dr. Warach again told Boydston that he could perform light duty work.  R. 675.

On January 20, 2010, agency physician Dr. Ruth Stoecker, M.D. prepared a Physical Residual Functional Capacity Assessment. R. 722-28.  Dr. Stoecker opined that Boydston could lift twenty pounds occasionally and ten pounds frequently; sit, stand and/or walk six hours in an eight-hour day; balance occasionally; and climb, kneel, crouch, and

crawl frequently.  Dr. Stoecker opined that Boydston should avoid concentrated exposure to vibration.  R. 723-25.  Dr. Stoecker opined that Boydston would be limited "for constant flexion extension activities in his wrists" due to carpal tunnel syndrome.  R. 723-24.  Dr. Stoecker opined that Boydston otherwise had no physical functional limitations.  R. 723-25. Dr. Stoecker opined that Boydston's statements were not credibly supported by the medical records.  R. 726.

On February 2, 2010, Boydston saw Dr. Wilson.  Boydston reported that he was having left hip pain.  Boydston's wife attended the appointment. She reported that Boydston was experiencing memory loss and confusion. Boydston reported having continuing neck pain.  R. 757.

On March 30, 2010, Boydston saw Dr. Wilson.  Boydston reported that he can no longer read because of his neck pain.  He also reported pain between the shoulder blades, in his lower back, and in his left hip. Boydston reported that he could not bend his neck and was using a cane to walk because of the hip pain.  R. 764.

On June 1, 2010, Boydston saw Dr. Wilson.  Boydston reported that he was at the end of his rope.  Dr. Wilson stated that Boydston had multiple myalgias.  R. 785.  On June 15, 2010, Boydston saw Dr. Wilson.  Boydston reported that he stopped taking a new medication because he became

violent and had pain in the back of his head.  Boydston also reported he got a pinched nerve when he lifted or used his cane in public.  Dr. Wilson stated that Boydston was at his maximum medical improvement and was still on no work at this time.  R. 783-84.

On July 13, 2010, Boydston saw Dr. Wilson.  Boydston reported that he woke up with a headache on the right side.  He also reported a burning pain in his right leg and pain in his right shoulder.  Dr. Wilson stated that Boydston had a history of myofascial syndrome.  R. 781-82.

On August 17, 2010, Boydston saw Dr. Wilson.  Dr. Wilson diagnosed myofascial syndrome.  Dr. Wilson stated that Boydston had been unable to work.  Dr. Wilson stated that Boydston had to lie down much of the day.  R. 779-80.

On October 19, 2010, Boydston saw Dr. Wilson.  Boydston reported that he felt like he was "hit by a truck."  R. 777.  Boydston reported he got tired holding his head up.  Dr. Wilson stated that Boydston had no alleged improvement since the injury.  R. 777-78.

On January 19, 2011, Boydston saw Dr. Wilson.  Dr. Wilson stated that Boydston had no change in his symptomatology or medicines. Dr. Wilson assessed Boydston with myofascial syndrome.  R. 775-76.

On April 19, 2011, an evidentiary hearing was held before the Administrative Law Judge (ALJ).  R. 1-35.  The ALJ presided in Chicago, Illinois.  Boydston and his counsel appeared by video conference from Hannibal, Missouri.  Vocational expert Jeff Goldfarb appeared.  R. 3, 56. Boydston testified first.

Boydston testified that about a month after the accident, he went back to work for about a week.  R. 14.  He was limited to light duty.  He testified that he stopped because the pain became unmanageable.  He testified that his employer also did not have any light duty work.   He testified that his employer was not able to accommodate him with a light duty position.  R. 11.  He testified that his employer tried to put him on pulling orders.  The job entailed lifting, pulling products off shelves and packing them for shipment.  He stood two to three hours a day and sat the rest of the time.  He lifted products that weighed between once ounce and five pounds.  Boydston testified that he kept getting sharp pains in his hip and cramps in his hips.   R. 13.  He only worked the job for a week.

Boydston testified that Dr. Wilson told him he could no longer work the light duty job pulling orders.  He testified that Dr. Wilson told him he was not supposed to be working.  R. 15.

Boydston testified that he has continued to have pain since the accident. He testified that he had pain in his back, neck, and the right side of his head. He testified that he had constant pain that never went away. He testified that the level of pain fluctuated, but the pain never went away. R. 17. Boydston testified that the pain became worse when he moved his head, "Not supporting my head and moving my head, looking around a lot." R. 18.

Boydston testified that he used a sheet to support his head. He wrapped the sheet around his neck. He testified that he could, "lay my head on it to rest my muscles." R. 18. He kept the sheet wrapped around his neck for three hours on average. Boydston testified that he used a sheet in this way five or six days a week. R. 18-19. Boydston also testified that he lay down regularly to support his neck. He testified that he usually lay down about five hours a day. R. 19-20.

Boydston testified that his pain level elevated if he could not use the sheet or lie down to support his neck. Boydston testified that he had constant headaches every day, but the headaches got worse, or "flared up" if he did not support his neck. R. 20-21. He testified that the flare-ups would last two to three hours. R. 22.

Boydston testified that he took hydrocodone and gabapentin daily for pain.  He testified that the medication and headaches caused him to sleep during the day.  He testified that he fell asleep frequently, about once a day in the afternoon.  He testified that he usually slept for about two hours during these episodes.  R. 22-23.

Boydston testified that repeatedly looking down or looking around to right or left aggravated his pain.  Boydston testified that, due to the pain, he could only look down for less than a minute and could only look around for five minutes.  Boydston testified that he could stand for an hour at a time and for a total of about three hours in an eight-hour day.  Boydston testified that he could sit for an hour at a time and for a total of about three hours in an eight-hour day.  Boydston testified that for the remaining time he would need to lie down and support his neck.  R. 24-25.

Boydston testified that his back pain was different from his neck pain and headaches.  He described the back pain as a burning sensation between the shoulder blades.  He testified that he got the pain several times a day, for a total of about five or six hours a day.  He testified that he typically experienced back pain about three times between 8:00 a.m. and 5:00 p.m. each day.  He testified that he cannot carry more than twenty pounds because of his back pain.  R. 25-26.

Boydston testified that he had pain in his right hip when he walked. He testified that he could walk for an hour before the hip pain caused a problem.  Thereafter, he testified that he would have to use his cane.  He testified that he could walk a total of three hours in an eight-hour day either standing or walking.  R. 27-29.

Boydston testified that he could not sleep due to the pain.  Boydston stated, "I have days I stay up all the time."  R. 29.  He testified that he stayed up all the time, "Maybe two or three times a week."  R. 29. Boydston testified that he would be "[i]ncredibly tired and weak" the next day.  R. 30.

Vocational expert Goldfarb then testified.  The ALJ asked Goldfarb to assume a person of Boydston's age and education who could perform light work but could only stand and walk for six hours in an eight-hour day; could not constantly look down and from right to left; and could not lift above his shoulders.  R. 30-31.  Goldfarb opined that such a person could perform Boydston's past work as a telemarketer, but none of his other past work. R. 32.  The ALJ noted that Boydston had some history of claustrophobia and might have troubles working as a telemarketer if the job required working in a booth.  The ALJ asked Goldfarb the percentage of

telemarketers that work in booths.  Goldfarb opined that at least 75% of telemarketers worked in booths.  R. 32-33.

The ALJ asked Goldfarb if other jobs would be available that did not require "too much bending over and too much turning of the head."  R. 34. Goldfarb opined that such a person could perform a clerk job, of which 215,000 existed nationally, and 900 in the state; and a food and beverage order clerk, of which 230,000 existed nationally, and 1,900 in the state. R. 34.

Goldfarb opined that the person in the ALJ's hypothetical question could not work if he had to lie down two hours in an eight-hour day.  R. 34. Goldfarb also opined that if a person was off-task for fifteen percent of the day, he could not perform the jobs Goldfarb identified.  R. 35.

## THE DECISION OF THE ALJ

The ALJ issued her decision on April 22, 2011.  R. 56-74.  The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires that the claimant not be currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).

If true, Step 3 requires a determination of whether the claimant is so severely impaired that he is disabled regardless of his age, education and work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this requirement at Step 3, the claimant's condition must meet or be equal to the criteria of one of the impairments specified in 20 C.F.R. Part 404 Subpart P, Appendix 1 (Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to his prior work considering his age, education, work experience, and Residual Functional Capacity (RFC).  20 C.F.R. §§ 404.1520(e), 416.920(e).  If the claimant cannot return to his prior work, then Step 5 requires a determination of whether the claimant is disabled considering his RFC, age, education, and past work experience.  20 C.F.R. §§ 404.1520(f), 416.920(f).  The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden on the last step; the Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005); Knight v. Chater, 55 F.3d 309, 313 (7th Cir. 1995).

The ALJ found that Boydston met his burden as Steps 1 and 2 of the Analysis.  Boydston had not engaged in substantial gainful activity since July 18, 2007, and he suffered from the severe impairments of myofascial pain, headaches, obesity, chronic neck pain, and back pain.  R. 58.  At Step 3, the ALJ found that Boydston did not have an impairment or combination of impairments that met or equaled a Listing.  R. 60.

At Step 4, the ALJ found that Boydston had the RFC to perform light work, but with no lifting above his shoulders and without constant looking down or looking left to right.  R. 60.  The ALJ relied on the functional capacity evaluations and the opinions Dr. Warach.  The ALJ also relied on the fact that the medical tests did not show a condition that would cause Boydston's claimed limitations.  R. 70.  The ALJ also relied on the opinions of Drs. Panepinto and Stoecker.  R. 71.

The ALJ rejected Dr. Wilson's opinions as inconsistent, conclusory, and inconsistent with the other medical evidence.  Dr. Wilson first stated that Boydston could work in 2007 and 2008, but later took him off work in 2009.  The ALJ found that Dr. Wilson failed to give an adequate explanation for his opinion, and his opinion was inconsistent with the other medical evidence in the record.  R. 70.

In making the RFC determination, the ALJ also found that Boydston's testimony about the severity of his symptoms was not credible.  Boydston's description of his pain in the medical records was inconsistent.  He told Dr. Warach he had 90% improvement, but he told Dr. Wilson he had no improvement.  Boydston's testimony was not consistent with the level of treatment provided.  Boydston's testimony was also inconsistent with the fact that both Drs. Warach and Wilson released him to work at light and sedentary work several times.   R. 71-72.   The ALJ concluded,

> The description of the symptoms and limitation which the claimant has provided throughout the record has generally been inconsistent and unpersuasive.  His symptoms are unusual and are not typical for the impairments which are documented by medical findings in this case.

R. 72.  The ALJ concluded at Step 4 that Boydston could not perform his past relevant work.  R. 72.

At Step 5, the ALJ found that Boydston could perform a significant number of jobs that exist in the national economy.  The ALJ relied on the RFC determination; the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2; and the opinions of vocational expert Goldfarb that Boydston could perform the charge account clerk job and food and beverage order clerk job.  R. 73.  The ALJ concluded that Boydston was not disabled.  R. 74.

Boydston appealed the decision of the ALJ.  On September 25, 2012, the Appeals Council denied Boydston's request for review.  The decision of the ALJ then became the final decision of the Defendant Commissioner. R. 36.  Boydston then filed this action for judicial review.

## ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence.  In making this review, the Court considers the evidence that was before the ALJ.  Wolfe v. Shalala, 997 F.2d 321, 322 n.3 (7th Cir. 1993).[3]  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971). This Court must accept the findings if they are supported by substantial evidence, and may not substitute its judgment.  Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  This Court will not review the credibility determinations of the ALJ unless the determinations lack any explanation or support in the record.  Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008).  The ALJ must articulate at least minimally her analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).

---

[3] Boydston makes brief reference to medical records submitted after the ALJ issued her decision. Boydston Brief, at 9 (citing R. 805-808).  These records are not relevant to the review sought in this case.

The ALJ must "build an accurate and logical bridge from the evidence to his conclusion."  <u>Clifford v. Apfel</u>, 227 F.3d 863, 872 (7th Cir. 2000).

The decision of the ALJ is supported by substantial evidence.  The RFC finding is supported by the opinion of Boydston's treating physician Dr. Warach, by the two functional capacity evaluations, and the opinions of agency physicians Drs. Panepinto and Stoecker.  The ALJ's finding at Step 5 that Boydston could perform a substantial number of jobs in the national economy is supported by the RFC finding and the opinions of vocational expert Goldfarb.  Thus, the ALJ's determination that Boydston was not disabled is supported by substantial evidence.

Boydston argues that the ALJ erred in giving little weight to Dr. Wilson's opinions.  Boydston argues that the evidence supports Dr. Wilson's opinions.  The issue is not whether some evidence in the record supports a medical opinion that was rejected by the ALJ.  The question is whether the ALJ's decision to reject the medical opinion is supported by substantial evidence.  Clearly, such substantial evidence exists in this record.  Dr. Wilson's opinions conflicted with the opinion of another treating physician, Dr. Warach.  Dr. Wilson's opinions conflicted with the functional capacity evaluations in the record.  Dr. Wilson's opinions conflicted with the opinions of agency physicians Drs. Panepinto and

Stoecker.  The ALJ's decision to discount Dr. Wilson's opinions is supported by substantial evidence.

Boydston argues that the ALJ erred in failing to develop the record sufficiently.  The ALJ stated in her decision, "Dr. Wilson's opinion is conclusory, providing very little explanation of the evidence relied on in forming that opinion."  R. 70.  Boydston argues that the ALJ should have sought additional information from Dr. Wilson regarding the basis for his opinion in order to meet her obligation to fully develop the record. Boydston Brief, at 9-10.

The Court disagrees.  The ALJ has an obligation to contact a physician or otherwise develop the record if the evidence in the record is inadequate to determine whether a claimant is disabled.  20 C.F.R. § 404.1527(c)(3).  In this case the record was amply developed.  Boydston submitted years and years of detailed medical records.  The ALJ reviewed those records meticulously.  See R. 61-69.  She had more than sufficient information on which to make her decision.  The deficiencies in Dr. Wilson's opinions did not detract from the ample other evidence in the record that allowed the ALJ to make a determination.  The Court sees no error in not developing the record further.

Boydston argues that the ALJ erred in not complying with the requirements of SSR 82-59 when she found that Boydston was not compliant with medical recommendations for treatment.  The ALJ stated that Boydston "failed to follow the recommendations made by treating doctors . . . ."  R. 72.  The Commission has set forth a detailed set of findings that an ALJ must make in order to determine that a claimant was not disabled because he did not follow recommended treatment.  SSR 82-59.  Boydston argues that the ALJ erred because she failed to make these findings.

The Court disagrees.  SSR 82-59 applies when an ALJ determines that a person is disabled because he failed to follow recommended treatment.  The ALJ, however, did not find in this case the Boydston was disabled because he failed to follow medical treatment.  Rather, the ALJ found that Boydston was not disabled in his current condition even though he failed to follow medical treatment.  R. 72.  The ALJ referred to Boydston's failures to follow suggested treatment in connection with her credibility determination.  She did not find that he was disabled because he

failed to follow medical treatment.  SSR 82-59 does not apply.  There was

no error.[4]

Lastly, Boydston argues that the ALJ erred in her credibility

determination.  Boydston argues that the ALJ used only boilerplate

language to justify her credibility determination.  The Court disagrees.  The

ALJ explained the basis for her credibility determination.  Boydston's

statements in the record were inconsistent and his testimony was

inconsistent with the medical record.  R. 72.  Ample evidence in the record

supports this conclusion.  Throughout 2008, Boydston reported to

Dr. Warach that he reached 90% improvement in his pain level since the

accident (e.g., April 10, 2008, R. 562)); during the same time period he told

Dr. Wilson that he had no improvement or little improvement (e.g., April 22,

2008, R. 622-23).  Boydston reported to Dr. Warach that he completed the

work hardening therapy, but the therapy records show Boydston terminated

his course of therapy early because Boydston told the therapist he was

going to have neck surgery.   R. 568, R. 600.  The medical records give no

indication of any such surgery.  Boydston testified at the hearing that he

slept every day for two hours in the afternoon due to his medications.

---

[4] Boydston also criticizes the ALJ for commenting on the possibility that Dr. Wilson may have been motivated out of sympathy for his patient Boydston.  See R. 70; Boydston Brief, at 10.  Boydston argues that the comment demonstrates that the ALJ was biased against him.  Boydston presents no evidence to support his speculation, and the Court sees no evidence of bias in the record.  The ALJ's decision shows that she made a fair and impartial decision based on a careful review of the record.

R. 22-23.  Moments later he testified his pain kept him awake "all the time," night and day, two to three days a week.  R. 29-30.   These inconsistencies in the record provide more than enough evidence to support the ALJ's credibility determination.  This Court will not disturb the finding.

WHEREFORE Defendant Commissioner of Social Security has filed a Motion for Summary Affirmance (d/e 12) is ALLOWED, and Plaintiff Boydston Brief in Support of Motion for Summary Judgment (d/e 10) is DENIED.  The decision of the Commissioner is affirmed.

THIS CASE IS CLOSED.

ENTER:  January 24, 2014

_____ *s/ Byron G. Cudmore*_____
UNITED STATES MAGISTRATE JUDGE